UNITED STATES, Appellee

v.

ALVIN A. FLOYD, Private, U. S. Army, Appellant

2 USCMA 183, 7 CMR 59

<!-- redacted block -->

No. 745

Decided February 12, 1953

<!-- redacted block -->

LT. COL. George E. Mickel, U. S. Army, and 1ST LT. William S. Maxwell, U. S. Army, for Appellant.

LT. COL. Thayer Chapman, U. S. Army, and 1ST LT. Bernard A. Feuerstein, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted on one specification alleging assault with intent to commit murder in violation of Article 134 of the Uniform Code of Military Justice, 50 USC § 728, and two separate specifications alleging the offenses of assault and battery in violation of Article 128 of the same Code, 50 USC § 722. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for ten years. The reviewing authority approved the sentence as rendered, except he reduced the confinement to a term of seven years. The findings and sentence, as approved by the convening authority, were affirmed by a board of review in the office of The Judge Advocate General of the Army, and we granted accused's petition for review limiting the issues to the three following questions: (1) Was there substantial evidence to support the finding of guilty of assault with intent to commit murder? (2) Did the law officer err in instructing the court that the elements of the offense were an assault by the commission of an act which might "possibly" have been accompanied by an intent to commit murder? (3) Did the law officer err in failing to define murder?

I

The first issue does not require extended discussion but requires a short resumé of the evidence. The record would permit a court-martial reasonably to find that on June 26, 1951, the accused, who was an experienced prizefighter, was present in a Korean home. At about 8 o'clock p.m. on that date, six American soldiers belonging to the same unit as did the accused, approached two Korean girls who were near the house. The girls ran into the home and apparently alerted the accused who was inside. The soldiers proceeded onto the porch of the house and were met by the accused who had stepped outside. He asked what they were doing and after having received some reply he threatened to kill all of them if they did not leave. The soldiers started to leave when the accused, after having re-entered the house, and reappearing, approached Private First Class Young who was at the rear. An exchange of words was started between Young and the accused but it ended abruptly when Young was struck in the face and knocked into a ditch in a dazed condition. The accused then assaulted two other soldiers and it was at that time when it was noticed he had a bayonet knife in his hand. When Young recovered he began to run away but was followed by the accused. During the chase and while he was approximately fifty feet to the rear of Young, accused threw the bayonet striking

184

Young in the head. The cut received by Young required five stitches to close and resulted in his being hospitalized for a short period of time.

Accused's version was to the effect that he challenged the soldiers while they were on the porch, and having received an unsatisfactory reply, he went back in the house to put on some fatigue clothes. When he returned he did not have a bayonet or knife in his possession. As he approached Young, the latter assumed a boxer's stance and accused, thinking Young might strike him, reacted instinctively and hit first. Because of his training as a boxer his reflexes naturally acted automatically and Young's posture precipitated the fight. The fight was limited to a personal encounter and a dangerous weapon was not used.

We believe the foregoing resumé of facts is sufficient to show that a court martial could reasonably find the accused guilty of the offense of assault with intent to murder. After threatening to kill any or all of the soldiers unless they left the premises, accused disappeared into the house, obtained a knife, returned, caught up with Young, and started an altercation. After being struck and knocked down, Young, when he recovered, attempted to escape from any further beating. The accused pursued and while in pursuit deliberately threw a dangerous weapon with enough force that it hit Young in the head after carrying a substantial distance. The accused contends he neither possessed nor threw a knife but the court-martial was at liberty to disbelieve his testimony and to conclude that he was the aggressor and that he threw the instrument which hit Young in the head. This finding would sustain the assault and leave the specific intent to kill as the remaining element of the crime. This element must be inferred from the facts and circumstances surrounding the knife-wielding and the statement, acts and conduct of accused. While it is difficult to determine his true mental condition, the outward and visible signs posted by him preponderate in favor of an intent to kill. He first gave persuasive evidence of his intent by threatening to kill. He followed up on his threat by arming himself with a weapon which was adequate to carry out his announced intention. He pursued Young, an unwilling victim, knocked him down, and then proceeded to attack two other members of the group. When he noticed Young had recovered and was running away from the conflict, accused turned around and pursued him. When he was within about fifty feet of the fleeing victim, he hurled a knife with sufficient force and accuracy that it travelled straight to its mark. The intent to kill had been previously announced, the means attained, and the steps necessary to put it into execution were taken. We wonder what intent could be ascribed reasonably to accused unless it was to kill. Clearly, had death resulted from this sequence of events, a conviction of murder predicated solely on an intent to kill could have been returned.

By pointing out bits of evidence and placing them in a pattern which shows a specific intent, we do not wish to be understood as saying that they cannot be placed in a pattern which suggests different intents. It is entirely conceivable that the court-martial could have found accused intended to inflict grievous bodily harm, but in this connection it must be remembered that evidence which will support a greater offense will also support a lesser included one. In addition, a person is presumed to intend the natural and probable consequences of his acts purposely done and death or grievous bodily harm were probable results from the act of accused in throwing the bayonet. However, the scales weighing the two are not in balance as there is one factor which tilts them in favor of an intent to kill, and that is accused's declaration to the effect that he would kill anyone who did not move on.

## II

The instructions given by the law officer present the principal issues in this case and we shall discuss them in the reverse order from that stated earlier. We have on three or four

occasions, subsequent to the trial of this case, passed on the necessity of law officers defining a substantive offense when it is the basis of one of the forms of aggravated assault. In United States v. Banks (No. 382), 4 CMR 71, decided July 24, 1952, and United States v. Avery (No. 809), 4 CMR 125, decided August 6, 1952, which were cases involving offenses of assault with intent to murder, we held it was prejudicial error not to define murder because a proper definition of that crime was essential before an intelligent finding on specific intent could be made. The identical principle is herein involved and those holdings require that this case be reversed.

### III

This cause is a throwback to conditions found in the field shortly after the passage of the new Code. The case was tried on September 17, 1951, and none of our decisions on instructions were available to law officers at that time. As a result any critical comments must be viewed in that light and what we say may, in part, be repetitious of what has been said in earlier decided cases. However, this type of offense still causes law officers considerable difficulty in preparing and giving appropriate instructions and it may be worth while to repeat some of the principles if, by so doing, we can clear up some of the confusion. In this connection, we call attention to a few of the fundamental rules necessarily involved in instructing in this class of offenses. Assault with intent to murder is made punishable by Article 134 of the Uniform Code of Military Justice, supra. Murder is defined and made punishable by Article 118, 50 USC § 712. While assault with intent to commit murder is the phrase used to designate the offense in the Table of Maximum Punishments and in the discussion of assaults on page 384 of the Manual for Courts-Martial, United States, 1951, a less confusing description would be "assault with intent to kill." There seems to be fair reason to suppose that the words "kill" and "murder" are used synonymously in defining this offense. But confusion creeps in when

186

the term "murder" is used, particularly in view of its definition as set out in Article 118 of the Code.

A reference to that Article shows that there are many ways in which murder may be committed but they are grouped into four major subdivisions. The Article arranges the groups in the following manner:

"Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill; or

(2) intends to kill or inflict great bodily harm; or

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under paragraph (1) or (4) of this article, he shall suffer death or imprisonment for life as a court-martial may direct."

Sub-section (1) and the first half of sub-section (2) require an intent to kill as a necessary ingredient of the crime; but in sub-sections (3) and (4), and the latter part of sub-section (2), this intent is not essential. If, therefore, in instructing the court-martial the word "murder" is used by the law officer and its definition is obtained by referring to or reading all of Article 118, supra, a court-martial could find a person guilty of assault with intent to commit murder even though he only intended to inflict great bodily harm. This possibility should be studied in connection with sub-section (b)(2) of Article 128 of the Code, supra, which states:

"(b) Any person subject to this code who—

. . . . .

(2) commits an assault and intentionally inflicts grievous bodily harm with or without a weapon;

is guilty of aggravated assault and shall be punished as a court-martial may direct."

We can best illustrate how confusion creeps in by pointing out that an oft-used method of testing the offense of assault with intent to murder is, did the accused possess such an intent that had death ensued, he would be guilty of murder? This test breaks down if applied to the facts of this case for the following reason. Under sub-sections (1) and (2) of Article 118, if an accused either intends to kill or to inflict great bodily harm and the victim dies, he can be convicted of murder. While an assault, aggravated by the concurrence of an intent to kill, supports the crime of assault with intent to murder, the same assault aggravated by the concurrence of an intent to inflict grievous bodily harm, would only support a finding of guilty of an aggravated assault under Article 128. If, therefore, the accused could be found guilty of an assault with intent to murder predicated upon an intent to inflict great bodily harm, both Articles 128 and 134 would apply. Difficulties would be encountered because if the crime was considered as a violation of the former, a maximum sentence of five years could be imposed, while if it was held to transgress the latter, the maximum penalty would reach twenty years. Assuming the court-martial based its finding of intent to murder on a basis of intent to inflict great bodily harm, accused is convicted of a lesser offense but sentenced on a greater.

While counsel for the Government contend that "murder" is commonly understood to mean "kill" and that members of the court-martial would understand that the terms were synonymous it is worthwhile calling attention to the opinion rendered by the Staff Judge Advocate. He recommended that the findings be sustained and the reasons are as follows:

"However, an additional factor was injected into the situation by the accused in pursuing Young after all evidence of resistance, if indeed, there had been any, had ceased. His ensuing act in throwing the bayonet with an overhand motion a distance of fifty feet is indicative of an intent to inflict grievous bodily harm. It therefore follows that, had the victim succumbed to the injuries thus inflicted, it would have clearly been a case of murder, unpremeditated, at least. (CM 302897, Hicswa, 59 B/R 167, 185; CM 324729, Jackson, 73 B/R 331, 336). It is emphasized that a specific intent to murder or kill is apparently not essential, since such intent is not an essential element of the crime of murder. It is sufficient if the intent was merely to inflict grievous bodily harm (CM 318258, Lawhon, 67 B/R 187, 196; MCM, 1951 subpar 197e). That the aim of the accused was faulty, resulting in injury rather than death, which might have well resulted had the weapon struck a more vulnerable spot, is a circumstance fortunate for the victim, Young, but not one from which the accused can negative an intent to kill (Lawhon, supra, p 197)."

If a qualified lawyer could arrive at the conclusion that the intent to inflict grievous bodily harm would sustain a finding of assault with intent to murder, we surmise that some lay members of a court-martial, might reach the same result.

We can proceed one step further and apply the same reasoning to felony murders. Rephrasing a portion of Article 118, it would read: "Any person who, without justification or excuse, unlawfully kills a human being when he is engaged in the perpetration or attempted perpetration of burglary, . . . is guilty of murder." It can be seen that if a given felony can be substituted for specific intent and used as a predicate to sustain a finding of assault with intent to murder, then an assault with intent to rob and assault with intent to murder would be one and the same. Again the sentences would be different. This supposed hypothesis appears to approach the ridiculous and

anyone would hardly expect to find instructions muddled to this extent but this case vividly portrays how little discrimination is sometimes exercised in submitting inapplicable and misleading instructions.

It is to be remembered the accused was charged with committing an assault with intent to murder by throwing a bayonet knife which struck and injured another. The instructions were, for the most part, excerpts read from the Manual which had no application to the facts in the case and which gave the court-martial no guide by which to govern its findings. The law officer commences his instruction in the following way: "Charge I alleges an assault with intent to commit murder, a violation of Article 134 of the Code." He then proceeded to read a discussion from the Manual. It started with a general observation and then continued thus: "To constitute an assault with intent to murder with a firearm, it is not necessary that the weapon be discharged; and in no case is the actual infliction of injury necessary. Thus, if a man with intent to murder another deliberately assaults him by shooting at him, the fact that he misses does not alter the character of the offense." Thereafter he continued to read from the paragraph which concerned the use of a blank cartridge, shooting at one and by mistake, hitting another, and shooting into a group with intent to murder someone. It should be apparent that all of this discussion is irrelevant and immaterial and could not assist the court in determining the issues in the case at bar. The mere fact that illustrations can be found in the Manual does not make them relevant. They must concern themselves with the facts and issues involved in the particular case.

## IV

While this issue was not included in our grant of review, we again call attention to the error of ▪ law officers in failing to give instructions on included offenses. Here the law officer mentioned assault with intent to commit voluntary manslaughter, aggravated assault, assault and battery, and assault. However, with the possible exception of the last two the offenses remained undefined. We can see little good in enumerating the included offenses unless the court-martial is in some way helped by instructions which set forth the necessary elements. Moreover, they should not be enumerated unless brought into issue by the evidence. If the law officer is to permit the court to consider an aggravated assault as an included offense, he should define the offense so that the court members can fit the facts to the definition. If he does not intend to give an instruction as to its elements, he should not mention it. Every offense which is reasonably raised by the evidence should be mentioned and must be the subject of an instruction with its attendant limitations and should there be doubt this ought to be resolved in favor of the accused. There is no way in which appellate bodies can ascertain what a court-martial uses as a measuring rod to determine the appropriate degrees of an offense unless the gradations in issue are identified clearly by instructions and the accused is entitled to have the accuracy of the rod determined on appeal.

## V

The last issue concerns whether the law officer erred in giving the following instruction:

 ▪ "The necessary elements of proof, Gentlemen, will be found in the specification itself; in that the accused, on or about a certain date, at a certain time alleged in the specification, did commit an assault upon a person named in the specification, by committing a certain act, which act might possibly have been within the precept of the original discussion that I gave you; and, should death ensue, would be a murder.

"The discussion as to the proof will be found on the bottom of Page 385 of the Manual:

'(a) That the accused assaulted a certain person, as alleged; and

(b) the facts and circumstances of the case showing the existence at the time of the assault of the intent of the accused to commit murder . . . as alleged.' "

The latter part of the instruction had some characteristics of clarity, but the first part is so confused and so difficult to analyze that it could not have helped the court. We are unable to ascertain what precept or command the law officer was referring to as his previous discussion has been related and it dealt principally with firearms. Assuming the instruction did not mislead or confuse the members of the court-martial, it could not have assisted them.

Counsel for the Government contend that the ambiguity in the instruction was eliminated by other instructions immediately following and when considered as a whole, no prejudice resulted. We need not determine this contention as the conviction is being reversed for reasons heretofore assigned and it is extremely doubtful that an instruction bearing any resemblance to the one here in issue will be used in subsequent cases.

The findings of guilty on the two specifications of assault and battery are unassailable and those are affirmed. The decision of the board of review on the charge alleging a violation of Article 134 is reversed and the cause is returned to The Judge Advocate General of the Army with direction to proceed in a manner not inconsistent with this opinion.

Chief Judge QUINN and Judge BROSMAN concur.