UNITED STATES, Appellee

v.

HUBERT E. VICK, Private E–1, U. S. Army, Appellant

3 USCMA 288, 12 CMR 44

No. 2506

Decided September 4, 1953

LT COL James C. Hamilton, U. S. Army, MAJOR Edwin Doran, U. S. Army, and 1ST LT Richard B. Dempsey, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Following trial by general court-martial, convened at Fort Benning, Georgia, the accused was convicted of desertion with intent to shirk important service—namely, shipment to the Far East Command—in violation of Article 85(a)(2), Uniform Code of Military Justice, 50 USC § 679(a)(2). The convening authority approved and an Army board of review has affirmed the conviction. On petition of the accused, this Court granted further review, limiting consideration to the question of the sufficiency of the evidence to sustain the conviction.

### II

By special orders, petitioner was directed to proceed from Fort Benning, Georgia, to Camp Stoneman, Pittsburgh, California, for June 1952 shipment to the Far East Command. Several days after his arrival at Stoneman pursuant to these orders, petitioner absented himself without leave—surrendering some thirty-two days later at his point of initial departure, Fort Benning, Georgia. Petitioner testified in his own defense, and stated that—having completed less than two years of schooling—he could not write, and that he was likewise unable to read, save that he could recognize his own name. He testified further that, in fact, he proceeded to Camp Stoneman on the basis of oral instructions, and that he was totally unaware of the contents of his written orders. His protestation of illiteracy was corroborated to some extent, at least at the trial. The accused also contended that he was unaware either of the fact that Stoneman was a staging area for the Far East Command, or of the proximity—or even the existence—of the San Francisco Port of Embarkation. He stated that his unauthorized departure from Stoneman was precipitated by the frustration of an intense desire for combat duty in Korea. In

support of this he related that, shortly after his arrival at Stoneman, he was informed by a sergeant, and later by a corporal, that he would not be shipped overseas inasmuch as an insufficient period of service remained under his current tour of duty as a National Guardsman. He felt—he stated—so thwarted at this unexpected turn of events that he decided of his own motion wholly to abandon the west-coast project and to return to Fort Benning. The disappointing conversation with the sergeant was corroborated by one Jaco, a soldier who had accompanied the accused from Fort Benning to Stoneman under similar orders, and with whom Vick had unofficially reappeared at Benning July 14, 1952. Jaco, it may be observed, was being held pending trial on an identical charge when he testified in this case.

### III

It is settled beyond doubt that shipment to the Far East Command is "important service" within the purview of Article 85(a)(2) of the Code, *supra.* United States v. Taylor, 2 USCMA 389, 9 CMR 19, decided April 15, 1953; United States v. Hemp, 1 USCMA 280, 3 USCMA 14, decided April 8, 1952; United States v. Shull, 1 USCMA 177, 2 CMR 83, decided February 18, 1952. However, the critical question in this case has to do with the sufficiency of the evidence bearing on the intent of the accused as a matter of law.

First, the court-martial must have inquired whether he in fact knew that he was scheduled for shipment to the Far East Command. If he did not possess this information, then he can hardly have entertained an intent to shirk that service. A copy of the special orders sending accused to Camp Stoneman for shipment to the Far East Command was introduced in evidence, and it is admitted that a copy of those orders was delivered to him before he departed from Fort Benning. In the ordinary

**289**

case, this delivery would constitute well-nigh conclusive proof that the accused was fully aware of his impending shipment to an overseas command. But this is not the usual case. The accused here has testified that he cannot write, and that he can read his own name only. This testimony, as noted above, was corroborated by the testimony of a non-commissioned officer to the effect that before his transfer, the accused had worked under the former's direction at Fort Benning as a "runner." During this period he had uniformly asked the destination of an item handed him for delivery, despite the fact that all such items were clearly labeled with that information. Accused stated that he was directed to proceed to Camp Stoneman and was advised of the date he should arrive there. However, he denied that he was ever told that he was scheduled for overseas shipment. The Government established the delivery of orders to the accused, but did not show that they had been read to him.

For its part, the Government relies on a series of inferences to support its contention that the accused did, in fact, know of his assignment for overseas duty. Would the accused have been directed orally to proceed to Camp Stoneman merely, without reference to the reason for transfer? From his habit of requesting that papers be read to him, would he not have asked to have his orders read? Can he reasonably be expected to have traveled to Camp Stoneman with two other soldiers, similarly earmarked, and to have arrived in ignorance of his mission? Can he have discussed the likelihood of an overseas assignment with personnel at his new station and have remained unenlightened? Finally, how could any man possibly spend nine days at Camp Stoneman—as did accused before his departure—and remain uninformed of the primary function of that station? The Government puts all of these questions and others with vehemence—and with special reference to the accused's professed yearning for combat duty. It is incredible—the prosecution argues—that the accused did not know the purpose of his transfer to Camp Stoneman.

We must agree that it is difficult to believe that the accused did not understand the reason for his reassignment from Fort Benning to Stoneman. At the same time, it is difficult always to comprehend the character and extent of the ignorance of which an illiterate man is capable. Be that as it may, we sit as judges, not as jurors. The question of whether the accused knew of his overseas destination was one of purest fact. It is not for us to say that the evidence was insufficient to support the court-martial's obvious finding merely because we, or any of us, believe that inferences inconsistent with knowledge may be drawn from it. "To say that would make us triers of the fact. We may say that the evidence is insufficient to sustain the . . . [finding] only if we can conclude *as a matter of law* that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than . . . [that of knowledge] could be drawn from the evidence. Stopelli v. United States, 183 F2d 391, 393 (CA9th Cir). We are unable to reach the conclusion necessary for reversal on this point.

However, a finding that the accused fully recognized the character of his ultimate destination does not complete the data of the evidentiary issue before the court-martial—the problem of his intention when he left Stoneman without authority. As reported earlier, the accused related as a witness that, following his arrival at the replacement center, he was told informally by two non-commissioned officers that he would not be sent overseas—for the reason that he was a National Guardsman with but little more than six additional months to serve. Insofar as one of these conversations is concerned, the accused's story was corroborated by the testimony of Private Jaco. However, this witness had absented himself without leave at the time of the unauthorized departure of the accused, and, together with the latter, had "turned in" at Benning something more than a month later. This testimony could well have been regarded by the court as self-serving more than a little—and, in the last analysis, the value of the reported conversation depends largely on the credit

accorded Vick and the one who was his companion in at least some sort of misconduct. The court-martial appears to have resolved this issue against the accused, and in doing so acted safely within its province. United States v. Creamer, 1 USCMA 267, 3 CMR 1, decided April 3, 1952; United States v. Slozes, 1 USCMA 47, 1 CMR 47, decided November 20, 1951.

Granting that the accused knew of his Far East Command destination at the time he absented himself without leave, and recognizing as well that through that absence he did, in truth, avoid that which legally constitutes important service, we are unable to say as a matter of law that the court erred in concluding that the accused intended to accomplish that which, as a matter of fact, did come about. United States v. Squirrell, 2 USCMA 146, 7 CMR 22, decided January 26, 1953. In this determination we have not left out of account the fact that the accused took the stand as a witness, vehemently denied an intention to desert, and vigorously asseverated an active desire for duty in Korea. Both the court-martial and the board of review, acting reasonably, were fully authorized to weigh these assertions of Vick's, together with the remainder of his testimony and, as well, with all other developed facts and proper inferences concerning his absence—this for the purpose of evaluating his credibility on the point in light of the entire evidential picture. Moreover, the triers of fact were permitted, in weighing his testimony and determining its credit, to take cognizance of the deep personal interest which an accused person in a criminal case has in its outcome. United States v. Ferretti, 1 USCMA 323, 3 CMR 57, decided April 18, 1952. The court-martial here completely rejected accused's story. Regardless of what we would have done in the premises, we cannot say that it was unjustified in its disbelief. It follows that we are unable to say that its findings of guilt were based on insufficient evidence. United States v. O'Neal, 1 USCMA 138, 2 CMR 44, decided February 7, 1952; United States v. McCrary, 1 USCMA 1, 1 CMR 1, decided November 8, 1951.

Accordingly the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.