UNITED STATES, Appellee

v.

WALTER E. HOLMAN, Private E-2, U. S. Army, Appellant

3 USCMA 396, 12 CMR 152

No. 2132

Decided September 18, 1953

LT COL George M. Thorpe, U. S. Army, and 1ST LT Michael E. McGarvey, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, 1ST LT Richard L. Brown, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

In so far as pertinent at this time, the record here discloses that in the early evening of May 20, 1952, the accused engaged in a quarrel with a fellow soldier named Shirfield. It appears that the accused, Holman, believed that Shirfield had reported to the First Sergeant of their common unit the fact of his, Holman's, unauthorized absence during the day. Witnesses reported the accused to have said: "I guess you told him. I'll fix you." A scuffle between the two was terminated through the interven-tion of bystanders, and Shirfield left the scene of the altercation—the Special Service tent—and proceeded to the company mess hall. Accused purposefully visited the mess hall shortly thereafter and engaged Shirfield in a physical encounter of more serious proportions. It seems that the former had acquired a large rock on his way to the messing facility, and that he struck Shirfield on the head with it while they were struggling. This second encounter ended when Shirfield threw accused to the ground and the latter cried: "I give

**397**

up." However, when he regained his feet, the accused is said to have threatened: "Shirfield, I'll get you." Witnesses related that at the time of this incident the accused was not drunk, but appeared to be in a cursing frenzy of rage, swearing that he would kill Shirfield. Several enlisted men, not including Shirfield, escorted the accused to his tent and attempted to return him to calmness. When it seemed that he was sufficiently quiescent, his attendants relaxed their vigilance. At that juncture—and suddenly—accused lunged for his carbine, which was nearby, and thrust a round into the chamber. The others hastened to remove it from his grasp. While the accused and the others were struggling, one shot was fired. No one was injured. At the close of this episode the accused was removed to a hospital, and to accomplish this purpose it was found necessary to strap him to a stretcher and to carry him. En route, he struggled and talked incoherently. A sedative drug was administered by medical officers at the hospital.

Upon the basis of this evidence, the accused was charged with and convicted by general court-martial of assault with intent to commit murder with a dangerous weapon—an offense proscribed by the Uniform Code of Military Justice, Article 134, 50 USC § 728—by firing and attempting to fire a carbine at the persons who had escorted him to his tent. The conviction has been approved by the convening authority and affirmed by a board of review. On petition of the accused, this Court granted a further review here, limited to the following two issues:

"1. Whether the evidence was sufficient to support the findings of guilty of the offense of assault with intent to commit murder (Specification 1 of Charge IV).

"2. Whether the instructions of the law officer were complete and adequate."

II

According to the Manual for Courts-Martial, United States, 1951, paragraph 213d(1)(a), in order to sustain a conviction of assault with intent to commit murder, it is necessary to establish "an assault aggravated by the concurrence of an intent to murder, that is, *an intent to commit an act which, should death ensue, would be murder*." (Emphasis supplied). We considered this italicized language in United States v. Floyd, 2 USCMA 183, 7 CMR 59, decided February 12, 1953, and held that, for the sound reasons there set out, the phrase "intent to commit murder" must be regarded as synonymous with the term "intent to kill." See also United States v. Woodson, 3 USCMA 372, 12 CMR 128, decided this date. To kill an individual means to produce that individual's death. Hence an assault with intent to murder John Doe must mean an assault accompanied by an intent or purpose unlawfully to produce John Doe's death. This latter intent is a quite different phenomenon from an intent to perform an act which may reasonably be expected to produce death. Hence, *as a matter of law,* the offense under scrutiny is not made out by establishing merely an assault with such a nature and under such circumstances as might reasonably be expected to result in death—this, although such a showing may in itself, and in a proper case, constitute sufficient evidence of a purpose to kill, and thus as a *matter of fact* sustain findings of guilt. See United States v. Apple, 2 USCMA 592, 10 CMR 90, decided June 1, 1953. The net of all this is that an assault with intent to commit murder requires not merely a general intent, but a *specific* one—a specific intent to kill.

This is but a restatement of the rule ordinarily announced by doctrinal writers, all of whom appear to agree that a specific intent to murder—that is to kill unlawfully—is an essential ingredient of the crime in question in the present case. Warren on Homicide, §§ 128, 129; Clark and Marshall, Crimes (4th ed., Kearney), § 202; Wharton on Homicide (3d ed., Bowlby), § 138. Indeed, it is the view adopted by this Court by clearest implication in United States v. Floyd, supra—and after a full consideration of the problem as it exists under the Uniform Code and the current Manual. Indeed, too, it is the only approach which may be defended ration-

ally in the face of relevant provisions and analogies found in this Court's primary legal sources, the Uniform Code and the 1951 Manual.

The following penalties are assessed against the present crime, together with the only other offenses closely related thereto, by the Manual, *supra*, paragraph 127c, Table of Maximum Punishments. Assault with intent to commit murder: 20 years. Assault with grievous bodily injury intentionally inflicted: 5 years. Assault with a dangerous weapon: 3 years. This Court has held that a *specific* intent to inflict bodily harm is an ingredient of the second crime mentioned above. United States v. Backley, 2 USCMA 496, 9 CMR 126, decided May 12, 1953. Moreover, the line separating an act reasonably calculated to result in grievous bodily harm and one similarly expected to produce death is indeed a thin, if not an indistinguishable one. Yet the maximum punishment, as regards confinement, for the crime of assault with intent to commit murder—in which no sort of injury is a necessary ingredient —is exactly four times as great as that provided for what is in full legal effect an assault with intent to inflict grievous bodily injury with such injury actually inflicted! Bearing in mind that this Court has held a specific intent to be an element of the latter offense, does it not seem ridiculous to suppose that we would be willing to deny that a specific intent to kill is not likewise an ingredient of the former?

The Manual, *supra,* paragraph 213d (1) (c), makes it clear beyond peradventure that a specific intent to rape is an element of assault with intent to commit rape. In speaking of this crime the Manual says:

"This is an assault accompanied by an intent to have unlawful sexual intercourse with a woman by force and without her consent. *The accused must have intended to overcome any resistance by force, actual or constructive, and to penetrate the woman's person. Any less intent will not suffice. . . .*" [Emphasis supplied].
Yet the two offenses, assault with intent

to murder and assault with intent to rape, are specifically linked in the Table of Maximum Punishments, and identical maximum punitive action is assessed against them. Could we possibly say that the intent element of the latter crime may be satisfied by the existence of "an intent to do an *act* reasonably expected to *result* in rape"? Merely to put the question is to demonstrate its absurdity. Why, it may be asked, should the offense before us now be approached differently?

And what of assault with intent to rob, treated in the Manual, *supra,* paragraph 213d(1) (d) of which provides:

"This is an assault with the concurrent intent to steal property *by taking it from the person . . . against his will, by means of force or violence or putting him in fear. . . .*" [Emphasis supplied].
Are we willing to deem the intent element here satisfied through "an intent to do an *act* reasonably expected to *result* in robbery"? We think not.

And so of assault with intent to commit sodomy of which the Manual says in paragraph 213d(1) (e):

"The assault must be against a human being and must be with the intent to commit sodomy. *Any less intent, or different intent, will not suffice."* [Emphasis supplied].

It must be clear beyond cavil that the sources of military law have, and should have, intended to reserve the crime of assault with intent to murder for only those instances of intentional malignancy in which the accused genuinely, albeit unsuccessfully, proposed to produce the death of his victim. Lesser offenses, of course, are those in which the accused acted with a purpose to inflict serious bodily harm merely, and, of course, those in which, with a general intent only, he did no more than to assault another with a dangerous weapon. There is no inconsistency whatever between this view and our holding that the crime of unpremeditated murder requires only a general intent. United States v. Craig, 2 USCMA 650, 10 CMR

**399**

148, decided June 24, 1953. Our task in each case has simply been to discern and declare statutory intent.

### III

Omitting any consideration of the situation in which one intends to kill another through shooting, but, in error, fires or attempts to fire at a third person—which is wholly inapplicable to the facts of this case—the question here simply becomes one of whether the evidence adduced at the trial was sufficient to sustain the conclusion that accused specifically intended to produce the death of one or more of those persons who were attempting to wrest the carbine from his grasp. That the accused may have intended ultimately to kill his enemy, Shirfield, who, be it remembered, was not one of those present and participating in the struggle for the carbine, is not enough in the present factual setting—although it is certainly relevant to establish the basic mental state of the accused. As we see it, the practical question as cast in the evidentiary framework of this record is whether the accused was so bent on the murder of Shirfield that he intended specifically to kill anyone who barred his path.

Reviewing the testimony recited in earlier paragraphs, we have concluded that the evidence cannot be ▬▬▬▬▬ ▮ said to be insufficient as a matter of law to support the court's findings. Indeed, the wild hatred of the accused appears not to have been directed solely against Shirfield, for a witness testified that the former, at the time of the mess hall incident, had threatened that he was "going to kill a few NCO's." When the accused grasped his carbine, and purposefully thrust a round into the chamber, it cannot be overlooked that he was faced by the group whose members had restrained and calmed him a matter of moments before. He was, of course, fully aware of the vigorous resistance they would offer to any attempt on his part to renew his attack on Shirfield. Although the problem has not been entirely easy of solution, we cannot say as a matter of law—and with the foregoing items before us—that all reasonable minds

would be in agreement that the hypothesis that the accused did not intend to kill those who blocked his path to Shirfield was a reasonable one. Stoppelli v. United States, 183 F2d 391, 393 (CA 9th Cir); United States v. Vick, 3 USCMA 288, 12 CMR 44, decided September 4, 1953.

### IV

With regard to the second issue specified, accused contends that the instructions of the law officer concerning the necessity for proof of an intent to murder were vague and misleading—to his prejudice. We have carefully examined the instructions given in light of the objection, and have concluded that—viewed as a whole—they do not suffer the infirmity asserted by the accused. United States v. Roman, 1 USCMA 244, 2 CMR 150, decided March 19, 1952; United States v. Shepard, 1 USCMA 487, 4 CMR 79, decided July 25, 1952. Although not a model of precision and clarity, when considered in their entirety it appears that the court-martial was most assuredly advised that it was necessary to find an intent on the part of accused to kill those who stood in his path to Shirfield.

We have considered accused's other assignments, and have concluded that they are without merit. The evidence was wholly insufficient to have required an instruction regarding intoxication and its legal effect. With respect to the evidence of sanity, it is ▬▬▬▬▬ ▮ clear that it, too, fell far short of showing legal insanity, as was similarly the case in United States v. Trede, 2 USCMA 581, 10 CMR 79, decided May 29, 1953. Our opinion in Trede provides a sufficient response, and a distinctly negative one, to the assertion of appellate defense counsel that—although the evidence did not tend to establish legal insanity—the law officer was required to instruct the court-martial that its members should consider the disturbed state of the accused's mind, in relation to his ability to entertain a specific intent, to the same extent and on the same theory that instructions might have been demanded had there been abundant evidence of intoxication.

400

In accordance with the above, the decision of the board of review must be affirmed.

Chief Judge QUINN and Judge LATIMER concur.