Richard G. **AUGENBLICK**

v.

The **UNITED STATES.**

No. 357–64.

United States Court of Claims.

Jan. 22, 1975.

Joseph H. Sharlitt, Washington, D. C., attorney of record, for plaintiff. Neal E. Krucoff, Washington, D. C., and Lemuel R. Green, Canton, Ohio, of counsel.

Bruno A. Ristau, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before LARAMORE, Senior Judge, and DAVIS and NICHOLS, Judges.

DAVIS, Judge:

Our decision in 377 F.2d 586, 180 Ct.Cl. 131 (1967), invalidating plaintiff's court-martial conviction and dismissal from the Navy, was reversed by the Supreme Court, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (January 14, 1969). On the coming down of that Court's mandate, plaintiff immediately filed here a motion for leave to file a first amended petition. Believing that this proposed amendment raised issues, which, if open to judicial scrutiny should have been presented earlier, or merely stated or restated positions which had been rejected by the high court or were required by its decision to be refused, we denied (on April 4, 1969), 187 Ct.Cl. 727, the motion for leave to file the first amended petition, and ordered that our previous judgment be vacated and withdrawn and that the petition be dismissed.[1]

On July 14, 1969, plaintiff moved for leave to file a second amended petition and also to set aside our order of April 4, 1969. That motion and the proffered amendment invoked the Supreme Court's intervening ruling in O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (decided June 2, 1969); claiming that Augenblick's offense was not service-connected, plaintiff now asserted that the court-martial was without jurisdiction on that ground. The motion and the amendment also alleged, as a separate basis, that the general article, Article 134, 10 U.S.C. § 934, of the Uniform Code of Military Justice—under which Augenblick was convicted by the court-martial—was invalidly applied to his case. On August 20, 1969, plaintiff also moved for a stay of our order of April 4, 1969. Defendant opposed both applications.

---

1. Plaintiff sought certiorari from this decision; that petition is still pending in the Supreme Court since the parties agreed that it should await our decision on the second amended petition. 43 U.S.L.W. 3037 (U.S. Aug. 13, 1974).

At that time, there were pending before the Supreme Court, or about to be filed, certiorari petitions presenting the issue of the retroactivity of *O'Callahan*. On October 31, 1969, this court ordered that plaintiff's motion for leave to file his second amended petition be held in abeyance pending the Supreme Court's action on those certiorari petitions.[2] That Court did not reach and determine the retroactivity question until it decided Gosa v. Mayden, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873, on June 25, 1973, and we suspended ruling in the present case during that period, although we received some further briefing and argument.[3]

Even after Gosa v. Mayden, the constitutionality of Article 134 still remained an open question, and since that issue was then before the Supreme Court we held this case still further, awaiting an authoritative ruling on that point. The Supreme Court sustained the validity of Article 134 in Parker v. Levy, decided June 19, 1974, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439, and Secretary of the Navy v. Avrech decided July 8, 1974, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033.

It is now at last appropriate and necessary to act on plaintiff's request to add to his petition the two new issues of the retroactivity of *O'Callahan* and of the validity of the application to his case of Article 134.[4] Defendant urges that, in any event, plaintiff's efforts to raise those questions came too late, but we need not and do not reach that argument since we are persuaded that, on their merits, the two points are foreclosed by the Supreme Court's recent rulings.

## I

■ We think it clear that Gosa v. Mayden, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973), determines authoritatively that the Constitution does not require that the *O'Callahan* rule be applied to court-martial convictions occurring prior to June 2, 1969 (the date *O'Callahan* was decided). Though there was no opinion for the Court, the Court's judgment, taken together with the opinions of Mr. Justice Blackmun (for himself and three other Justices)[5] and Mr. Justice Rehnquist,[6] necessarily add up to that result. The decision was not ad hoc to the Gosa case alone. Five justices having voted on general grounds that the *O'Callahan* rule should not be applied to pre-*O'Callahan* cases, the Court was able to render a decision which, unlike a four-to-four affirmance, creates a binding precedent controlling the lower courts in comparable cases. It is immaterial that less than a majority of the Court upheld the legal proposition that *O'Callahan* should not be applied retroactively; the important thing is that a majority voted that *O'Callahan* should not control cases like the present one. *Cf.* Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949).

Plaintiff urges that Mr. Justice Blackmun's opinion would allow retroactivity if it could be shown that the fact-finding

---

2. In the same order we granted a stay of our order of April 4, 1969 (denying the motion for leave to file the first amended petition) until thirty days after our action on the motion for leave to file the second amended petition.

3. After Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), was decided without reaching *O'Callahan's* retroactivity, defendant moved here to lift the stay order of October 31, 1969 (*see* note 2, *supra*). That motion has not been acted upon and is still pending.

4. We had already received briefs on the bearing of Gosa v. Mayden, and the Article 134

issue. We have also had the benefit of oral argument and some further briefing after *Levy* and *Avrech*.

5. Holding that *O'Callahan* should not be applied retroactively. 413 U.S. at 685, 93 S.Ct. 2926.

6. Holding that *O'Callahan*, even if required to be applied retroactively if valid, should not be followed but should be overruled because wrongly decided. 413 U.S. at 692, 93 S.Ct. 2926.

in a specific case was particularly unreliable "in direct consequence of a generic disability within military justice" (plaintiff's words),[7] but we do not read the opinion that way. It ends its discussion of the point by saying flatly and without qualification (413 U.S. at 685, 93 S.Ct. at 2939: "We conclude that the purpose to be served by *O'Callahan*, the reliance on the law as it stood before that decision, and the effect of a holding of retroactivity, all require that *O'Callahan* be accorded prospective application only. We so hold [footnote omitted]." The ruling was across the board.

Gosa v. Mayden is sufficient to dispose of plaintiff's claim that he is entitled to the coverage of O'Callahan v. Parker. The majority of this court, through Judges Laramore and Nichols, holds, in addition, that Augenblick's offense, involving two servicemen in a deviant sexual act, was "service-connected," and therefore that *O'Callahan* would be inapplicable even if it were to be applied retroactively. Judge Davis would not consider this point, since it is unnecessary to do so, and expresses no opinion on the issue of service-connection.

## II

In Parker v. Levy, *supra*, and Secretary of the Navy v. Avrech, *supra*, the Supreme Court held that Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934 (the so-called "General Article"), is not unconstitutionally vague under the Due Process Clause of the Fifth Amendment where the accused has fair notice that his conduct is punishable under that provision, nor is the article facially invalid because of overbreadth. 94 S.Ct. at 2562; 94 S.Ct. at 3039–3040.

Plaintiff denies that these rulings control his case since, unlike Levy and Avrech, he was not initially charged with a violation of Article 134, but that section of the Code came into his trial only after all the evidence had been submitted. The original charge against Augenblick was solely sodomy under Article 125; at the close of the testimony the law officer instructed the court-martial that commission of an "indecent, lewd and lascivious" act in violation of Article 134 was a lesser-included offense which they could also find under the testimony.[8] The court then found Augenblick not guilty of sodomy (under Article 125) but guilty (under Article 134) of committing an indecent, lewd and lascivious act by wilfully and knowingly placing his head in the enlisted man's lap with his face in close proximity to the latter's exposed privates. *See* 377 F.2d at 590–591, 180 Ct.Cl. at 139. The question before us is whether this posture of the case compels or permits a disposition other than those in *Levy* and *Avrech*.

At the very least, those decisions of the high court demonstrate that plaintiff could not have complained of vagueness if he had been initially charged with an

---

**7.** Plaintiff asserts that is true in this case and in other military cases of sexual deviation. Brief of Plaintiff at 8–12 (filed Sept. 18, 1973).

**8.** The law officer instructed as follows:

"If you are satisfied by legal and competent evidence before you beyond a reasonable doubt only, one, that at the time and place alleged and in the manner indicated by the evidence the accused wrongfully committed an indecent, lewd and lascivious act with James O. Hodges, Jr., airman third class, United States Air Force but which act fell short of sodomy; and two, that under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the Armed Forces or was of the nature to bring discredit upon the Armed Forces, then you may, by exceptions and substitutions to the charge and specification, find the accused guilty of an indecent, lewd and lascivious act as violation of Article 134 of the Code. You will notice that he is charged with a violation of 125 of the Code."

Military law recognizes the notion of lesser-included offenses, and the right of the law officer to instruct on them (even over defense counsel's objection). *See* Art. 79, U.C.M.J. 10 U.S.C. § 879; Manual for Courts-Martial (1951 ed.), pp. 303–304; United States v. Floyd, 2 U.S.C.M.A. 183, 188, 7 C.M.R. 59 (1953); United States v. Wilson, 7 U.S.C.M.A. 713, 715, 716–17, 23 C.M.R. 177 (1957); United States v. Bairos, 18 U.S.C.M.A. 15, 17, 39 C.M.R. 15 (1968).

indecent, lewd and lascivious act under Article 134, and the proof had been the same as here in the actual trial. Augenblick could not reasonably have had any doubt that (a) the acts found by the court-martial were indecent, lewd, and lascivious, and (b) indecent, lewd and lascivious acts fell within Article 134. The former goes without saying and needs no elaboration. As for the latter, Appendix 6 of the 1951 Manual for Courts-Martial set forth (at p. 492) under Article 134 a form specification for an indecent, lewd and lascivious act with another (as well as related offenses such as indecent acts with a child, and indecent exposure, at p. 491).

The problem thus narrows to the invocation of Article 134 at the close of the case as a lesser-included offense. Plaintiff says he was deprived of due process because he was not on notice that Article 134 might be invoked in that fashion after all the evidence was in, and therefore had no opportunity to present evidence on, or mold his case as to, the elements of the Article 134 offense. This claim of lack of due notice evaporates when one considers the facts of Augenblick's trial. Of the elements of the crime of sodomy the one as to which the proof was weakest was actual penetration. We cannot believe that an officer accused of this type of sodomy would or could think he would go scot-free if actual penetration were not proved beyond a reasonable doubt, but the facts of the occurrence were as found here by the court-martial. Particularly in view of Article 134's specific coverage of indecent and lewd acts, the accused must have known that in those circumstances he could be found guilty of the related, lesser offense of lewd and lascivious conduct. That would be the reasonable expectation, borne out by prior holdings of the military tribunals that lewd acts un-

der Article 134 could be lesser offenses included in an offense such as sodomy under Article 125 or rape under Article 120. United States v. Jones, 13 C.M.R. 420, 422 (Army Bd. Rev., 1953); United States v. Headspeth, 2 U.S.C.M.A. 635, 10 C.M.R. 133 (1953). If plaintiff wished to proffer evidence relating to the lesser crime, he should have known that he had that opportunity. In the constitutional sense—that a defendant must not be convicted of a charge of which he has inadequate notice (Rabe v. Washington, 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed.2d 358 (1972); Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948) )—there was here sufficient notice that the offense of indecent, lewd and lascivious conduct under Article 134 could and might well be implicated.

We have discussed the question in terms of fair notice, rather than of the concept of "lesser-included offense," because the former raises a constitutional issue while the latter is, in itself, merely a matter of the proper interpretation of military law. Once it is decided that the constitutionally required due notice has been given, the problem of whether lewd conduct under Article 134 is technically a lesser-included offense under Article 125 no longer rises to the constitutional plane but is, rather, a non-constitutional issue of military law with which the civilian courts cannot normally deal if the military tribunals have fairly considered the problem. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); McDonald v. United States, Ct.Cl. No. 396–73, decided December 18, 1974; Artis v. United States, Ct.Cl., 506 F.2d 1387, decided December 18, 1974. In this instance the Court of Military Appeals has expressly held that the offense for which plaintiff was convicted was properly found a lesser-included crime under Article 125 (sodomy).[9]

9. After the Supreme Court's reversal of our original ruling, plaintiff applied to the Court of Military Appeals to reconsider its refusal to hear his case. He raised both the Article 134 point and the contention that *O'Callahan* governed and should be retroactively applied. The Court of Military Appeals rejected both arguments on their merits. 19 U.S.C.M.A. 638 (1970).

We have no reason to think that this view of the Court of Military Appeals is unreasonable or resulted from a lack of due and fair consideration. Before plaintiff committed his offense, that tribunal had already held, as we have pointed out, that lewd and lascivious conduct under Article 134 could be found as a lesser-included offense of sodomy or rape. As we have also suggested, it seems entirely reasonable and expectable that an incompleted act of sodomy should be treated and punished as a lewd act.

Plaintiff insists, however, that the Article 134 offense, as found here, embodies elements absent in the crime of sodomy, *i.e.*, the finding that the accused's conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit on the armed forces (see footnote 8, *supra*).[10] Those elements, he says, were not proved or canvassed at the trial which concentrated solely on sodomy. The answer is that the Court of Military Appeals was certainly not out of bounds when in effect it held that (a) as charged here, the crime of sodomy, in and of itself, necessarily embodied those same elements, and (b) that in this case the court-martial could find those same elements, with respect to the lewd and lascivious conduct, from the nature of the acts and circumstances themselves, it being unnecessary to have extraneous or independent proof of those factors. *Cf.* United States v. Sanchez, 11 U.S.C.M.A. 216, 217–18, 29 C.M.R. 32 (1960).[11] We repeat that if defense counsel thought he could persuade the court-martial that the conduct here did not embody either of those elements, he was free to introduce evidence to that effect (if he could).[12]

The result is that the second ground of the second amended petition which plaintiff proffers—that Article 134 was unconstitutionally applied to his case—is without merit, along with his claim that *O'Callahan* governs his case.

We hold, for these reasons, that plaintiff's motion for leave to file a second amended petition and for relief from judgment should be denied; that defendant's motion to lift the stay of proceedings and to deny further relief should be granted; and that the order of April 4, 1969, dismissing the petition should go into effect in thirty days.[13]

NICHOLS, Judge (concurring):

I concur with and join in Judge Davis's opinion. I would like to say, however, that there was not at any time any need to await a decision whether O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) was retroactive, because it was almost from the first apparent that Commander Augenblick's case was not one of those excluded from the jurisdiction of military tribunals by that authority. Moreover, the cloud over the constitutionality of Art. 134, dissipated in Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); and Secretary of the Navy v. Avrech, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974), had not increased to the dimensions of a man's hand during the earlier part of the long delay period. In plaintiff's able brief of September 27, 1971, the vagueness and possible unconstitutionality of Art. 134 was urged, but without the support of the lower Federal court decisions, which later accreted to it. We could have disposed of the *O'Callahan* problem on the grounds presently to be submitted, and of Art. 134 on the

---

**10.** This case does not involve the part of Article 134 which refers to "crimes and offenses not capital."

**11.** Plaintiff says that this is tantamount to a directed verdict of guilty, but this position is obviously incorrect. The court-martial was permitted, but not required, to find these elements from the proven circumstances. The law officer's charge was to this effect. *See* footnote 8, *supra*.

**12.** He was free, of course, to inquire from the law officer, before the evidence closed, whether the latter intended to charge the lesser-included offense.

**13.** Our order of October 31, 1969, stayed our order of April 4, 1969, until thirty days after action on the motion for leave to file the second amended petition (*see* footnote 2, *supra*).

cogent reasoning of Judge Davis's opinion.

## I

Commander Augenblick was not booked on a felony charge under D.C. law. In Sharkey v. United States, 19 U.S.C.M.A. 26, 41 C.M.R. 26 (1969), it is held that the *O'Callahan* doctrine does not deprive the military courts of jurisdiction to try offenses that would be dealt with as petty offenses in the civilian world, not requiring jury trial. I note that on their arrest, Commander Augenblick and his companion were booked for "disorderly conduct". This would dispose of the "service connection" issue at the threshold, if one were certain how the *Sharkey* doctrine would be applied to the instant case.

By the D.C.Code, § 22–1112, lewd, indecent or obscene acts are misdemeanors punishable, where a minor is not involved, by a fine of not over $300, or not over ninety days imprisonment, or both. They come under the ambit of "disorderly conduct" along with duelling, § 22–1102, and keeping a fierce dog, § 22–1111. This appears to be the nearest counterpart to the Art. 134 specification under which Commander Augenblick was convicted. For sodomy, by D.C.Code § 22–3502, the penalty is $1,000 fine or ten years imprisonment. This corresponds to the Art. 125 charge upon which Commander Augenblick was acquitted. I would guess that if left to civilian prosecution, Commander Augenblick would have been in slight or no jeopardy of ever being charged under § 22–3502. The booked offense, and the one that could have been proved, put him in jeopardy of moderate punishment for which the Constitution does not require indictment or jury trial. See cases cited in *Sharkey, supra.* I would, therefore, on authority of *Sharkey*, hold the *O'Callahan* exclusion of military courts from trying felonies committed in the civilian world, inapplicable here.

## II

Whether or not the above is accepted as valid, a concerned and principled application of the "service connection" concept requires the finding that such connection existed in this case. An article by an able and knowledgeable member of our bar, Colonel Charles M. Munnecke, O'Callahan Revisited and Buttoned Up, Bulletin No. 46, The Judge Advocate Journal, p. 11 (October, 1974), summarizes the decisions of the Court of Military Appeals, the lower Article III courts, and the Supreme Court, on the scope of "service connection". There is, he says, little relevant conflict among them, and the difficulty of determining "service connection" *vel non* has not been nearly as great as anticipated, save in the area of narcotics violations, which is now before the Supreme Court and may be resolved before our decision appears.

How do you determine "service connection?" The preferred technique since *O'Callahan* has been to look at the facts of *O'Callahan* and those of the case then at bar, to see if significant differences, favoring military jurisdiction, appeared. The military apparently lacked before *O'Callahan* a strong or any conviction that *O'Callahan's* type of crime had "service connection." The order allowing *certiorari* assumed it had none and the Government briefed and argued on that basis, 393 U.S. 822, 89 S.Ct. 224, 21 L.Ed.2d 93 (1968). Mr. Justice Harlan, dissenting at 395 U.S. 274, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), urged that the military had a strong interest in deterring rape, assault, mayhem and murder by its members upon the local civilian population. This has impressed many persons as true, but it might be answered that interest in deterring an offense and interest in trying it are two different things. The certainty of being consigned to the tender mercies of an enraged civilian population and tried before a jury of the victim's peers, might be a more effective deterrent to commission of crimes of *O'Callahan's* type, than trial by court-martial and military punishment following. Certainly *O'Callahan*, prospectively applied, does not protect servicemen against possibly harsher treatment than the military

would afford, and cannot be so construed. I gather that a military accused cannot even waive a civilian jury and elect a court-martial if he so desires for his own protection. It is no wonder the military leaders are now as complacent as Colonel Munnecke indicates they are, about the situation. I should expect that even now, if needed, there could be a forceful announcement delimiting the scope of "service connection", as seen by the Service heads, and it would if reasonable be entitled to much respect. It would not have to be ignored because of prior contrary court decisions, made by civilian judges on the basis of their own unaided perceptions as to the scope of military necessity. The prevailing silence on the subject may well reflect satisfaction with "service connection" as judicially determined.

Thus "service connection" has been determined up to now by the happenstance circumstances of *O'Callahan's* particular case, and the absence of any other guide as to the scope of "service connection", plus the failure of the service to define the extent to which denial of the right to try particular offenses will hamper them in · performing their missions. Nevertheless, when we have a crime to deal with wholly unlike *O'Callahan's* it appears to me that instead of a wooden use of the *O'Callahan* circumstances as tests, we should endeavor to ascertain from Service sources a conception of what the denial of their right to try—as distinguished from the desire to deter— may mean. I do not find anything in Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), that prohibits this.

Statutes and regulations sometimes announce special service interest in offenses of certain types. These must be regarded as stating a "service connection" by implication. In this category I would put the regulations on homosexuals that all three Services now have in force, and have had for many years, back to a time long prior to Commander Augenblick's arrest in 1961. These regulations divide homosexuals into classes I, II and III. (*See* our decision in Glidden v. United States, 185 Ct.Cl. 515 (1968) ). Class I involves offenses where the other party was an unwilling participant, or a minor. The regulations call for these offenses to be tried by court-martial. Class II are other homosexual offenses currently punishable. They may be dealt with by court-martial but more usually by administrative discharge, which may or may not be under honorable conditions. Class III are homosexual offenses committed prior to the current enlistment, and instances of persons with homosexual tendencies but no active involvement. These persons must be got out of the service, though of necessity with honorable discharges.

We may note the stress on just getting rid of the homosexual. Nothing that corresponds to this occurs in civilian justice. The military would unload their undesirables on the civilian world, but the reverse cannot occur. The time when the offender can be required to purge himself by enlisting in the military, has long passed.

I suppose that in civilian society the sovereign people formerly considered they had a right to prohibit and punish by law, behavior they considered infamous, without being required to show the offense had a victim, or in any way injured the fabric of society. This attitude was the basis of laws against sodomy, bestiality, acts against nature, etc., and continues to be the motive behind their enforcement so far as they are still enforced. The old attitude, however, is eroding, and we now are told that society has no right to punish a victimless crime. Exemptions of "consenting adults" from laws against sodomy, etc., are frequently urged and sometimes enacted. I suppose a person who urged such exemptions might still, if heterosexual, think twice about making a long journey in company with a person he suspected to be homosexual. There is no real conflict between these two attitudes. Where the laws remain on paper unchanged, lack of zeal and enthusiasm by the civilian police in their enforce-

ment may afford a practical shield to the homosexual in his way of life.

Civilians can choose their companions, but when you join the military you embark on an extended voyage with persons not of your choice. In the Navy, Commander Augenblick's branch, it may be six months under water in a submarine. If persons you regard as undesirables are in the crew, their companionship is foisted upon you. As concerns officers, the Services have the additional problem that those who, by their own acts, cause themselves to be popularly regarded as pariahs, can hardly provide effective leadership. The reasonableness of the popular assignment of pariahship hardly matters.

According to Navy Regulation, 32 C.F.R. § 719.107(e)(2)(iii), 38 Fed.Reg. 5997, March 6, 1973; 32 C.F.R. § 719.-107(c), 39 Fed.Reg. 18436, May 28, 1974, cases of homosexuality in which mild penalties have been imposed by civilian authorities upon conviction, may still be tried by court-martial. It continues:

> * * * Homosexuality is a more serious problem in the military society because of the close-contact living and working conditions of its members.

According to Everhard, Problems Involving The Disposition of Homosexuals in the Service, 2 Air Force Judge Advocate General's Bulletin 20 (Nov. '60) another basic concern of the Services about homosexuals is infection of others: " * * * they must have partners and often prey on the youthful, naive, or greedy." "Cures", psychiatric or otherwise, are not considered because "it is not primarily a Service responsibility", and "the prognosis is almost uniformly poor." This attitude is in contrast with civilian judges, who frequently demand psychiatric treatment for convicted homosexuals. The Service's first, second and third priority in dealing with homosexuals are, as stated, to get rid of them. I take it Commander Augenblick had his court-martial because, as a regular officer, he was immune to stigma type administrative discharge. *See*, Carter v. United States, Ct.Cl., 509 F.2d 1150 decid-

ed today. All the court-martial did to him, however, was the stigma type discharge, which might have been inflicted administratively on a reservist.

I think the foregoing demonstrates that the Services have and have expressed a special and peculiar interest in setting their own course of dealing with their homosexuals, whether an offense is committed on or off the base, in or out of uniform, during working or leave time. Effectuating their policy is seen as a military necessity. Civilian judges could not possibly achieve the results demanded by the military. On the other hand, the Services do not desire either to reform the offender, or to inflict retribution for breach of the Mosaic law upon him. Except in the aggravated Class I cases, they are content to get rid of him albeit with a stigma type discharge in some instances as here.

Conceding, however, that "service connection" would be a problem if one of the partners in the unnatural act had been a civilian (United States v. Shockley, 18 U.S.C.M.A. 610, 40 C.M.R. 322 (1969)) here they were both military, and one, Commander Augenblick, greatly outranked the other. As I conceive it—and we do not, I note again, have the help we should have from the military—the guilt of partners in crime or accomplices is never equal if one is an officer and the other an enlisted man. The former owes a duty to the latter to guide him into courses of right conduct. A breach of this duty would be an offense unknown to the civilian law. The latter is conceived to be without capacity to act on his own volition when in company of an officer and under his direction. That Commander Augenblick wore civilian clothes I do not think exonerated him from these duties, at least as long as the accomplice was uniformed. He could not shed his obligations as an officer by putting on civilian clothes and going off the base for his contact. I do not think a civilian judge or jury could handle this situation in a satisfactory manner. I note that Colonel Munnecke enumerates this very case as one where the *victim* (his word) was a serviceman. (His fn. 5,

p. 12). This is an appropriate classification of the case from a military point of view. The word "victim" is also used in the plaintiff's September 27, 1971, brief, albeit in quotation marks. The Commander would be regarded as having "preyed" on the enlisted man, in the word used in the Everhard article, *supra.* Counsel for Commander Augenblick have complained about the honorable discharge given the enlisted man, but the apparent disparity is fully explained by the considerations stated. He was a "victim".

Moreover, I would assign at least presumptive correctness to the decision by the Metropolitan police to turn the arrested offenders over to military custody. It was, by implication, a decision that the offense had "service connection", by the persons having to deal with the problem practically, at the working level.

In short, the application of the *O'Callahan* doctrine to this case is not a logical application of it but its *reductio ad absurdum.*

LARAMORE, Senior Judge, concurs in the opinion of Judge DAVIS and also concurs in the opinion of Judge NICHOLS regarding "service connection."