# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
CAMPANELLA, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Second Lieutenant LAWRENCE J. FRANKS**
**United States Army, Appellant**

ARMY 20140952

Headquarters, Fort Drum
S. Charles Neill, Military Judge
Lieutenant Colonel Derek D. Brown, Staff Judge Advocate (pretrial)
Colonel Steven C. Hendricks, Staff Judge Advocate (post-trial)

For Appellant: Jack B. Zimmermann, Esq. (argued); Captain Scott A. Martin, JA; Terri R. Zimmermann, Esq.; Jack B. Zimmermann, Esq. (on brief and on reply brief).

For Appellee: Captain Linda Chavez, JA (argued); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Cormac M. Smith, JA; Captain Linda Chavez, JA (on brief).

31 August 2017

---------------------------------
OPINION OF THE COURT
---------------------------------

FEBBO, Judge:

In this case, we hold that appellant's own fear of suicide does not support a defense of duress under current precedent. We hold that the offense of desertion with intent to shirk important service was factually and legally sufficient. We also hold that the military judge properly instructed the panel on the *mens rea* required for the offense of conduct unbecoming an officer.

A panel sitting as a general court-martial convicted appellant, contrary to his pleas, of desertion with intent to shirk important service and conduct unbecoming an officer, in violation of Articles 85 and 133 of the Uniform Code of Military Justice, 10 U.S.C. §§ 885, 933 (2012) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dismissal and confinement for four years.

We review this case under Article 66, UCMJ.[1]  Appellant assigns four errors.[2]  We find three require discussion but no relief.  We have considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they lack merit.

## BACKGROUND

In spring 2008, appellant graduated from the United States Military Academy at West Point and commissioned as a medical service corps officer.  In January 2009, appellant reported to 2nd Battalion, 22nd Infantry Regiment (commonly referred to as the "Triple Deuce"), 1st Brigade Combat Team (1BCT), 10th Mountain Division (Light Infantry) at Fort Drum.  His duties included tracking and reporting on the medical readiness of the soldiers in the unit.  His unit was on the "Patch-Chart"[3] to deploy to Iraq in September 2009 as part of the "Surge."  The unit had completed reset from a redeployment, had started a new training cycle, and was preparing for another deployment, but had not yet received deployment orders.

Appellant asserts he grew disillusioned with his assignment, became depressed, and developed suicidal ideations.  He stated he wanted direct contact with patients and did not enjoy a "desk job."  According to appellant, he had unreported and undiagnosed depression and suicidal ideations during high school and while attending West Point, but avoided his suicidal ideations through physical and

---

[1] The court heard oral argument in this case on 22 February 2017.

[2] In the one assignment of error we do not directly address, appellant asserts the military judge erred by excluding the testimony of a retired U.S. Army Brigadier General (BG) and a French Army BG on the merits.  As we find that the military judge did not abuse his discretion or commit error in concluding that the defense of duress did not apply in appellant's case, we likewise conclude it was not error to exclude testimony on the defense of duress.  Similarly, the military judge ruled character evidence from the French Army BG about appellant's foreign-service was not admissible on the merits.  The military judge concluded the character trait of a "good legionnaire" was not pertinent to the charge of voluntarily leaving his unit to enlist and serve in a foreign military service. *See* Military Rule of Evidence [hereinafter Mil. R. Evid.] 404(a)(2)(A).  The military judge did allow appellant to present other testimony and documentary evidence concerning his service in the Legion.  We find no abuse of discretion by the military judge.

[3] The "Patch Chart" is a planning document projecting the timeline of deployments for U.S. Army units.  The units are identified on the timeline by their unit patch.

athletic activities. He decided to join the French Foreign Legion ("the Legion") because he believed it would be more rigorous and challenging.

On 30 March 2009, after purchasing a round trip ticket, appellant left his unit and flew to France. Before he left, he paid his rent and left his military identification card, military identification tag, West Point class ring, cell phone, and keys to his office. Appellant left his military clothing and equipment ("OCIE") and asked his roommate to turn it in. He also wrote letters to his roommate and family indicating his suicidal ideations.

On 6 April 2009, appellant executed a five-year enlistment contract with the Legion.[4] Appellant was provided a new identity by the Legion. During his enlistment, appellant deployed to Mali, Central African Republic, and Djibouti. He served as a team leader, as a medic, and on the security detail for a French Army BG.

Back in the United States, in January 2010, the Triple Deuce deployed to Afghanistan.

On 6 April 2014, appellant completed his five-year enlistment contract and was discharged from the Legion. The next day, appellant traveled to Wiesbaden, Germany and voluntarily surrendered to the U.S. Army. The government charged appellant with two specifications of desertion and one specification of conduct unbecoming an officer. A "sanity board" ordered pursuant to Rule for Court-Martial [hereinafter R.C.M.] 706 found that when appellant left his unit, he had a severe mental disease or defect—major depressive disorder—as well as recurrent, severe and active suicidal ideations and an alcohol use disorder. However, the sanity board found he understood the wrongfulness of his actions and could participate in his defense.

At trial, appellant admitted it was wrong to leave the Army for five years. He claimed, however, his "tunnel vision" and thoughts of suicide left him with two choices: commit suicide or join the Legion. Appellant reasoned that since France is an ally of the U.S. and the Legion was engaged in fighting terrorism, joining the Legion was not conduct unbecoming an officer. Appellant asserts at trial and on appeal he should be commended for his decisions.

After a trial consisting of fifteen government and defense witnesses, dozens of exhibits consisting of hundreds of pages of documents, and a record of trial

---

[4] As part of the French enlistment process, a certificate was provided by a French Deputy Chief Physician that appellant had "no disability."

consisting of 1,196 pages, the panel found appellant not guilty of desertion with intent to remain permanently away, but guilty of desertion with intent to shirk his unit's deployment, as well as conduct unbecoming an officer.

**LAW AND DISCUSSION**

*A.  Desertion with Intent to Shirk Important Service*

Appellant's duress defense claim on appeal can be summarized as follows: appellant asserts that if one will kill himself if he does not commit a crime then he is under duress and cannot be criminally liable for committing the crime.  While we reject appellant's argument, our conclusion should not be misinterpreted as a lack of understanding of the seriousness and gravity of the mental health issues of service members.  Rather, our analysis focuses on whether appellant attempted to pursue a defense that was not available to him under current precedent.

*1.  Does Fear of One's Own Suicide Support a Defense of Duress*

A military judge has an affirmative duty to instruct on special defenses reasonably raised by the evidence.  R.C.M. 920(e)(3).  An instruction on a defense is not required if no reasonable panel member could find the defense applicable. *United States v. Schumacher*, 70 M.J. 387, 389-90 (C.A.A.F. 2011).  The appellant's defense counsel specifically requested the military judge to instruct the panel on the duress defense.  Therefore, the instructional issue for the duress defense is preserved on appeal.

The defense of duress applies when:

> the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act.  The apprehension must reasonably continue throughout the commission of the act.  If the accused had any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

R.C.M. 916(h).

Appellant argues the military judge erred by ruling that appellant's own suicidal ideations could not support a defense of duress.  Appellant asserts that having only two choices, kill himself or join the Legion, he intentionally left his unit

4

to avoid an overwhelming desire to kill himself. Appellant thought the "rigorous and regimented lifestyle would cause his suicidal ideations to diminish."

There are several problems with appellant's argument, and we hold the military judge did not err by denying appellant's request to instruct the panel on the duress defense. Under appellant's theory, appellant is threatening himself. The defense of duress does not exist if the accused can avoid the threatened harm. If one is threatening oneself, then one can remove the threat. As the accused can remove the "threat" by no longer threatening himself, the accused can avoid the harm if he possesses the ability to exercise that choice. If appellant could not understand this dilemma because he suffered from a severe mental disease or defect, the appropriate defense would be lack of mental responsibility.[5] This is not to say that everyone contemplating suicide is suffering from a severe mental disease or defect, but for a lack of mental responsibility defense to exist, this would need to be the case.

Appellant argues his case is similar to *United States v. Hayes*, where the accused claimed if he did not steal and send funds to his mother, his mother would commit suicide. 70 M.J. 454 (C.A.A.F. 2012). There, the Court of Appeals for the Armed Forces (CAAF) did not rule out the possibility that a threat of suicide arising from another person *could* provide a basis for the defense of duress. *Id.* at 461-62; *See also, United States v. Toney*, 27 F.3d 1245, 1248 (7th Cir. 1994) (noting a threat of suicide may be a sufficient basis for coercion if the defendant took reasonable alternative steps to avoid the suicide); *but see United States v. Stevison*, 471 F.2d 143, 147 (7th Cir. 1972) (affirming the denial of a defendant's proposed coercion instruction where the defendant had not alleged that she had no opportunity, other than embezzling funds, to avoid her daughter's threatened suicide). The *Hayes* court, however, did not apply the defense of duress for one's own suicidal ideations.

---

[5] R.C.M. 916(k) provides for an affirmative defense of a lack of mental responsibility. If appellant, at the time of the commission of his offenses, was unable, due to a severe mental disease or defect, to appreciate the nature or quality or the wrongfulness of his acts, then he would be not guilty of the offenses. However, both at trial and on appeal, appellant repeatedly disavowed this defense. Appellant did not want to present evidence that would raise the issue of lack of mental responsibility, did not want to instruct the panel on the defense, and did not argue that he was not responsible for his conduct. Appellant has waived, not forfeited, the defense of lack of mental responsibility. The record demonstrates the waiver of this defense was made after consultation between appellant and counsel, and was not patently unreasonable.

Appellant argues the natural extension of *Hayes* would create a defense of duress for an accused's own suicidal ideations. Adopting this position could arguably make an accused's suicidal ideations a defense to any crime under the UCMJ except a homicide. Appellant is unable to cite one reported case that has adopted appellant's theory. Our research indicates every federal, state, and military court that has considered the issue has rejected the theory that a person's own compulsion or threat of suicide could raise a defense of duress.[6]

Furthermore, this court does not read *Hayes* as broadly as appellant. *Hayes* involved a situation where an accused believed another person was going to commit suicide. The *Hayes* court applied "the 'possible defense' standard that is intended to serve as a lower threshold than a prima facie showing because it is intended as a trigger to prompt further inquiry during a guilty plea inquiry pursuant to Article 45, UCMJ, and *United States v. Care*, 18 C.M.A. 535, 541, 40 C.M.R. 247, 253 (1969), not to determine whether the defense is available or whether members in a contested case should be given an instruction." *Hayes*, 70 M.J. at 458.

Accordingly, we hold, the defense of duress did not apply to appellant under current precedent. Accordingly, the military judge did not err in failing to give an instruction on the defense of duress. But, even if it did apply, the facts of appellant's suicidal ideations did not reasonably raise a defense of duress.

Even assuming arguendo a person's own suicidal ideations could create a "reasonable apprehension that the accused . . . would be immediately killed or [the accused] would immediately suffer serious bodily injury," this only addresses the first of the four elements required for the defense of duress. For the military judge

---

[6] *United States v. Bowling*, NAVY 20030001, 2003 CCA LEXIS 207, at *13 (N.M. Ct. Crim. App. 9 Aug. 2003) (a defendant's own suicidal ideations raises an issue of "mental competence vice the defense of duress" and is not a defense to leaving a unit without authority); *United States v. Sanchez*, No. 201400053, 2014 CCA LEXIS 378, at *8-9 (N.M. Ct. Crim. App. 30 Jun. 2014) (use of drugs to "ease pain" from withdrawal did not raise defense of duress); *see also Love v. State*, 271 Ind. 473, 393 N.E.2d 178 (Ind. 1979) (robbery for money to buy heroin to prevent drug withdrawal did not raise defense of duress); *State v. Gann*, 244 N.W.2d 746 (N.D. 1976) (duress could not be asserted where the defendant robbed to provide his family with food and shelter because the compulsion did not come from an outside source and remove the free will of the actor); *Degler v. State*, 741 P.2d 659 (Alaska Ct. App. 1987) (duress instruction not given and evidence not allowed where reason for robbery was to secure funds to attend a custody hearing, because defense of duress requires the use of unlawful force).

to instruct on the special defense, there must be some evidence as to each separate element of the defense. *United States v. Davis*, 75 M.J. 537, 541 (Army Ct. Crim. App. 2015) *aff'd, United States v. Davis*, 76 M.J. 224 (C.A.A.F. 2017) (*citing Schumacher*, 70 M.J. at 389-90) ("The military judge must answer the legal question of whether there is some evidence upon which the members could reasonably rely to find that each element of the defense has been established.") However, three essential elements of duress are plainly absent based on appellant's own factual recitation and testimony: the immediacy between appellant's actions and the perceived threat; the opportunity to avoid the harm threatened; and the continuation of immediacy throughout the conduct in question. The defense of duress did not apply to the facts in appellant's case.

First, the defense of duress requires the accused be under a threat of death or serious bodily injury. The sheer length of time necessary to carry out appellant's plan shows the situation could not have had the requisite immediacy. Before leaving his unit, appellant conducted research into various foreign military organizations, to determine if they accepted U.S. citizens. Having determined his eligibility to enlist in the Legion, appellant settled some of his personal affairs, washed and organized his military property for turn-in, and purchased a plane ticket to France. Afterward, he went to the airport and flew to France and, after a review process and executing a contract, enlisted in the Legion.

Additionally, for the defense of duress to apply, there must have been "no other reasonable alternative" other than joining the Legion. The record reveals appellant had other choices. He did not seek to resign his commission in the Army or seek a branch transfer to what he would consider a more rigorous and demanding combat arms branch or unit. Appellant could have sought mental health treatment, sought the advice of a chaplain, or checked himself into the hospital. Appellant's testimony that he did not seek mental health treatment because he did not want to be prescribed medication highlights this point. Appellant understood he could have sought mental health treatment but was allegedly concerned about the stigma of seeking treatment. However, he did not make any effort to seek assistance from outside the Army or from other professionals. Even accepting appellant's claims as true, this meant appellant understood he had options. Appellant *chose* to join the Legion because he preferred this course of action over seeking mental health treatment.

Lastly, the defense of duress requires the duress continue throughout the commission of the crime. Here, the threat of suicide would have had to remain throughout his entire five-year absence. Appellant himself specifically disavowed this claim and testified that once in the Legion, he continued to serve not because of

his fear that he would commit suicide, but because he had not finished his enlistment contract with France.[7]

Appellant took many steps to plan his desertion, had many opportunities to avoid or treat his suicidal ideations, and did not have suicidal ideations for the entirety of his five-year desertion. As the military judge rejected the defense of duress at trial, we likewise reject it here.

*2. Legal and Factual Sufficiency of Desertion by Shirking Important Service*

Appellant does not dispute his unauthorized five-year absence from his unit. He does not challenge that his unit's deployment was "important service." However, appellant states his motive[8] for leaving the unit and joining the Legion was not to shirk the deployment but to avoid committing suicide. Appellant asserts he did not know his unit was actually deploying and claims that to be guilty of the offense, the unit's deployment must be imminent.

In March 2009, the 1BCT had not yet received deployment orders to Iraq. The unit deployed to Afghanistan in January 2010.

Article 85(a)(2), UCMJ, provides: "Any member of the armed forces who . . . quits his unit, organization, or place of duty with intent to avoid hazardous duty or to shirk important service . . . is guilty of desertion." *United States v. Gonzalez* states:

---

[7] Around November 2012, appellant called a civilian attorney in the United States to get advice on being a deserter. The attorney informed appellant he would probably spend several years in prison for deserting the U.S. Army in a time of war and not fulfilling his eight-year service obligation for attending West Point and that serving in a foreign military organization aggravated his situation. After speaking with the civilian defense counsel, appellant wrote a letter to his command in the Legion sharing his civilian defense counsel's advice and declaring he was "absolutely not going to" turn himself in before the end of his five-year contract because he wanted to honor his contract and fulfill his duty to the Legion. Appellant stated he planned to surrender to the Army after 6 April 2014. In the letter, appellant never mentioned anything about suicidal ideations, depression, or any concern about not returning to the Army to avoid suicide.

[8] Motive may supply the reason for crime and may be a matter in mitigation; however, except in the limited instances where it constitutes a defense, motive does not negate criminality. *United States v. Huet-Vaughn*, 43 M.J. 105, 113-14 (C.A.A.F. 1995).

> Desertion with the intent to avoid hazardous duty or to shirk important service is a serious offense under military law. What distinguishes it -- and aggravates it -- from simple unauthorized absence, and even from desertion with intent to abandon the unit at a time when the presence of all hands is most critically needed.

42 M.J. 469 (C.A.A.F. 1995) (*citing United States v. Merrow*, 14 C.M.A. 265, 34 C.M.R. 45 (1963)).

The specific intent to shirk important service must be proven to exist in appellant at the inception or sometime during his absence from his unit. *Gonzalez*, 42 M.J. at 472 (*citing United States v. Vick*, 3 U.S.C.M.A. 288, 12 C.M.R. 44 (1953); *United States v. Shull*, 1 U.S.C.M.A. 177, 2 C.M.R. 83 (1952)). "Whether an intent to avoid some particular service existed in an accused is a subjective question of fact depending on proof of his direct statements or circumstances reflective of his state of mind." *Gonzalez*, 42 M.J. at 472 (*citing United States v. Apple*, 2 U.S.C.M.A. 592, 10 C.M.R. 90 (1953); *United States v. Taylor*, 2 U.S.C.M.A. 389, 392, 9 C.M.R. 19, 22 (1953)). "It is generally enough to prove the intent element that the court determine on the basis of substantial evidence that, when the unauthorized absence began, the duty or service was imminent and as a consequence of his absence, the accused in fact avoided it or had reasonable cause to know that he would do so." *Gonzalez*, 42 M.J at 473, n.6 (*citing Shull*, 2 C.M.R. at 88-89).

Appellant cites *Shull* for the proposition that in order to "shirk" important service the duty must be imminent as a matter of law. We disagree. We do not read *Shull* to require an imminent deployment as a precondition to shirking. As summarized by our superior court in *Shull,* imminence of the deployment is just one factor in determining a soldier's intent or lack of intent to shirk a deployment:

> In our view the actual physical, temporal, or administrative proximity of the accused to the service in question is not important in this type of case in any ultimate sense -- that is as a matter of law. These elements only function as items of circumstantial evidence raising inferences of intent of varying degrees of compulsion. It is conceivable, at least, that an absence without leave from a port of embarkation might not have been effected with a subjective intent to avoid overseas duty. Likewise it is logically possible, we believe, for a military person to absent himself unauthorizedly [sic] with such an intent on the very first day of his training period -- far removed in time, space, and competent orders from

9

> any threat of movement to a combat theater. What we
> have involved in these cases is simply a matter of proof --
> and that is exactly what we are faced with in the present
> case.

2 C.M.R. at 87.

The accused in *Shull* went on pass to resolve some family problems, overstayed his pass, and was gone for a total of twelve unauthorized days. *Id*. at 84-85. Before going on leave, he had volunteered to deploy to Asia and was informed that orders to the replacement company would "probably be issued" shortly. *Id* at 84, 88. He was never informed, however, that he had actually received orders to the replacement company or that without these initial orders he would be precluded from deploying. *Id*. at 88. The *Shull* court concluded there was no evidence presented that the accused's absence from his unit for twelve unauthorized days would cause him to miss any of the additional steps for him to deploy to Asia. *Id* at 87-88. The court determined the evidence was insufficient to support a twelve-day absence with the intent to shirk when the accused was in a replacement process that involved a "leisurely and perhaps pervious pipeline." *Id*.

As *Shull* recognized, to sustain a guilty finding the government must prove appellant had a specific intent to shirk important service. In most specific intent crimes, direct evidence of intent is often unavailable, as Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook] (10 Sep. 2014) instructs panel members.

It is a reasonable inference that if one absences himself from his unit immediately before a deployment or other important service, there was an intent to avoid important service. When the nexus between the absence and the important service becomes attenuated, the reasonableness of the inference grows weaker and weaker until it disappears all together.

While leaving a unit right before an imminent deployment is one way to prove intent to shirk, it is not the only way. Accordingly, we see our role on appeal as not trying to determine whether appellant's unit was about to deploy, but rather whether there are sufficient facts in the record to support that appellant left his unit with the intent to shirk, or, at some point during his five-year absence developed the intent to shirk. *Gonzalez*, 42 M.J. at 472 (The intent to shirk important service can be formed at inception or sometime during the absence from the unit).

In 2009, the President ordered a surge of troops into Iraq while the Army was still engaged in combat operations in Afghanistan. As a result, appellant's unit at Fort Drum appeared on the "patch chart" as part of the surge and was planning and training for deployment. A deployment of his BCT to Iraq or Afghanistan was not

just mere suspicion, conjecture, and speculation. In this case, when appellant left his unit, he understood his unit would deploy. As we discuss below, appellant admitted this through both pretrial statements and through his testimony. *Shull* recognized that, depending on the circumstantial evidence presented, a panel could determine that appellant formed the intent to shirk important service during training and "removed in time, space, and competent orders from any threat of movement to a combat theater." *Shull*, 2 C.M.R. at 87. Here, the evidence was factually and legally sufficient to support the panel's finding that appellant left his unit with the intent to shirk his unit's deployment.

Appellant's intent to shirk is illustrated in several ways. Appellant was a staff officer in his unit and was responsible for medical readiness. Appellant attended his unit's weekly command and staff and training meetings. As a member of the staff, he understood his unit was deploying. Appellant testified about the Triple Deuce's upcoming deployment:

> We just started a new training cycle. We had finished the reset, we had finished all the medical and administrative redeployment, all those orders now we starting—Triple Deuce was beginning to prepare for *the* upcoming deployment. (Emphasis added).

Appellant also discussed his unit's upcoming deployment with his roommate. In a letter to his roommate, 2LT Carney, appellant admitted that he was "running away from the U.S. Government" and did not expect 2LT Carney to visit him in jail. Appellant stated he was not afraid to deploy, but did not feel capable to lead an Army platoon during deployment. Appellant stated he was going overseas, indicated he was not coming back, and said goodbye to his parents.

In another letter to his parents, appellant discussed his "undisclosed depression" and suicidal ideations. He stated he made a mistake accepting his commission and "dooming" himself to personnel management and operational planning. Appellant informed his parents of the steps he took—such as fixing his car and leaving behind his personal property—to help them settle his affairs as a "deserter" from the Army. While appellant would later testify that he did not understand what "deserter" meant, his explanation is unconvincing. In fact, appellant testified before leaving, he specifically purchased a round trip plane ticket for less than thirty days from his departure day so he would not get dropped from the rolls of the Army. Appellant wanted to preserve his option to return within thirty days without entering deserter status. He testified he knew he was wrong when brought the plane ticket, left the unit, and flew to France and adopted a new identity.

Appellant argues since the Triple Deuce actually deployed to Afghanistan instead of Iraq, this undercuts both his knowledge of the deployment or that a

deployment was imminent. However, the subsequent change in deployment location does not negate appellant's intent to shirk the deployment. *Gonzalez*, 42 M.J. at 471 ("proof of the actual occurrence of important service by an accused's unit during his absence is not necessary for conviction" of desertion with intent to shirk important service) (citing *United States v. Squirrel*, 2 U.S.C.M.A. 146, 151, 7 C.M.R. 22, 27 (1953)); *see Apple*, 2 U.S.C.M.A. at 593, 10 C.M.R. at 91. As compared to the twelve-day unauthorized absence in *Shull*, appellant deserted his unit knowing he was going to enlist in a foreign military for five years. By agreeing to a five-year contract with a foreign military unit, appellant intended not only to avoid the one deployment he knew was coming, but all deployments with his U.S. Army unit over the next five years.

The panel concluded appellant deserted his unit and intended to shirk the unit's deployment. The panel did not have to conclude his primary motive must have been to avoid his unit's deployment. We find the evidence was factually and legally sufficient to support appellant's conviction for desertion with intent to shirk his unit's deployment.

## B. Conduct Unbecoming an Officer

Appellant asserts the military judge's instructions on the elements for conduct unbecoming an officer are insufficient after *Elonis v. United States,* 135 S. Ct. 2001 (2015) [9]; *see United States v. Gifford*, 75 M.J. 140 (C.A.A.F. 2016) (general order violation requires recklessness), and *United States v. Haverty*, 76 M.J. 199 (C.A.A.F. 2017) (*mens rea* required for violation of Article 92, UCMJ). Appellant argues that the military judge's instruction failed to specify a *mens rea* for the material element that his conduct was unbecoming or appellant intended to behave in a manner to dishonor or disgrace himself, or seriously compromise his standing as an officer. Appellant asserts he never intended for his conduct to be unbecoming an officer. Therefore, appellant argues that the military judge's instruction were insufficient to establish that appellant's conduct was unlawful.

## 1. Forfeiture

At an Article 39(a), UCMJ, session, the parties discussed the elements of conduct unbecoming an officer. Appellant's defense counsel objected to every element of the government's proposed instruction, stating the government's proposed instructions had no *mens rea* required for a conviction. Appellant's counsel asserted there should be another element in the instructions that appellant "intended to engage in conduct unbecoming an officer in order to be found guilty of

_____

[9] Appellant's trial concluded before the Supreme Court decided *Elonis*.

the offense." The military judge stated he would take appellant's concerns under advisement.

Later in the court-martial, the military judge informed the parties he was going to give an adapted version of the Benchbook instruction para. 3-59-1. The military judge's instruction added that the panel had to find appellant "wrongfully" enlisted and served in the Legion. Appellant's counsel did not object to the judge's instruction to the panel.

In general, whether a panel was properly instructed is a question of law reviewed de novo. *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017). R.C.M. 920(f) states "[f]ailure to object to an instruction . . . before the members close to deliberate constitutes waiver of the objection in the absence of plain error." Failure to object forfeits the issue absent plain error. *United States v. Ahern*, 76 M.J. 194 (C.A.A.F. 2017). When an "accused fails to preserve the instructional error by an adequate objection or request, we test for plain error." *United States v. Davis* 76 M.J. 224, 229 (C.A.A.F. 2017) (citing *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)); *see also United States v. Paige*, 67 M.J. 442, 449 (C.A.A.F. 2009).

By not objecting to the judge's modified instructions, appellant did not preserve the issue on appeal and we review for plain error.

### 2. Military Judge's Instructions

Article 133, UCMJ has only two elements: 1) that the accused did or omitted to do certain acts; and 2) that, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman. *Manual for Courts-Martial, United States* pt. IV, para. 59.b(2) (2012 ed.) [hereinafter *MCM*]. The focus of Article 133, UCMJ, is the effect of the accused's conduct on his status as an officer. *United States v. Conliffe*, 67 M.J. 127, 132 (C.A.A.F. 2009). The test for a violation of Article 133, UCMJ, is "'whether the conduct has fallen below the standards established for officers.'" *Id.* (*quoting United States v. Taylor*, 23 M.J. 314, 318 (C.M.A. 1987)). A determination if the conduct charged is unbecoming of an officer includes "taking all the circumstances into consideration." MCM pt. IV, para. 59.c(2). "Such circumstances incorporate the concept of honor." *Id.* "[E]vidence of honorable motive may inform a factfinder's judgment as to whether conduct is unbecoming an officer." *Id.* The subjective motivation of an accused is relevant to a charge under Article 133, UCMJ. *United States v. Diaz*, 69 M.J. 127 (C.A.A.F. 2010).

The military judge's instruction was tailored from para. 3-59-1(d) of the Benchbook and the statutory language of Article 133. At trial, the military judge did not preclude evidence from the appellant explaining his motive for leaving his unit

13

was to avoid suicide and diminish his suicidal ideations. Appellant also testified that he did not think joining the Legion was conduct unbecoming an officer. Indeed, appellant thought service in the Legion was honorable. The military judge properly instructed the panel to consider "all the facts and circumstances" of appellant's motive for leaving his unit and joining a foreign military service, before finding him guilty of the offense.

Furthermore, any alleged prejudice to the appellant with respect to Article 133, UCMJ not including a *mens rea* element was cured by the military judge's specific instructions to the panel. Although not required by the standard instruction, the military judge also instructed the panel that appellant's conduct had to be "wrongful." In considering the appellant's motives for leaving the Army and joining the Legion, the panel determined appellant's conduct was both "wrongful" and unbecoming an officer. Our superior court in *United States v. Rapert*, considered the effect of including "wrongful" as an element in an offense under *Elonis*. 75 M.J. 164 (C.A.A.F. 2016). The CAAF held the inclusion of "wrongful" as a *mens rea* "prevents the criminalization of otherwise 'innocent conduct,' and thus requires the government to prove the accused's *mens rea* rather than base a conviction on mere negligence." *Id*. at 169.

Based on a review of the record of trial and the arguments and briefs of counsel, the court finds the military judge did not error in giving instructions for conduct unbecoming an officer.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Senior Judge CAMPANELLA, concurring.

While I agree with the majority that the defense of duress did not apply under the facts of this case, I do not rule out the possibility that an accused's suicidal compulsion could be the basis of the defense of duress. *Hayes*, 70 M.J. at 461-63. While the majority points to lack of mental responsibility as the "appropriate defense," a soldier with suicidal ideations would need to suffer from a severe mental disease or defect and be unable to appreciate the nature or quality or the wrongfulness of his acts for the defense of lack of mental responsibility to apply. Not all who contemplate suicide are suffering from mental illness or do not understand the nature of their actions. This is precisely why lack of mental responsibility should not be the sole defense available in the unique military environment and context in which this issue could arise. The defense of duress allows an individual to avoid liability "because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present." *Dixon v. United States*, 548 U.S. 1 (2006) (internal citations and quotations omitted).

Accordingly, like our superior court, I "do not foreclose the possibility of a duress defense in the context of a suicide threat as a matter of law." *Hayes*, 70 M.J. at 463.

Judge WOLFE concurring.

Article 85(a)(1)-(3), UCMJ, lists three types of desertion. The first paragraph sanctions those who leave their unit with the intent to remain away permanently. The second paragraph prohibits quitting one's unit with the intent to avoid hazardous duty or to shirk important service. Appellant was charged with both of these offenses and convicted of the latter.

The third paragraph of Article 85(a), UCMJ, states "any member of the armed forces who . . . enters any foreign armed service except when authorized by the United States [] is guilty of desertion."

As appellant left his unit without authority and enlisted in a foreign army, the third paragraph of Article 85(a) appears to be tailor made for appellant's conduct. However, in 1954, the Court of Military Appeals held that when passing Article 85(a)(3), UCMJ, "Congress did not intend to create a new and separate offense, but merely sought to perpetrate a rule of evidence. . . ." *United States v. Johnson*, 5 U.S.C.M.A. 297, 301, 17 C.M.R. 297, 301 (1954).

The reasoning in *Johnson*—which focused on the *absence* of legislative history indicating an intent to amend Article 85, UCMJ—is inconsistent with the CAAF's current cannons of statutory interpretation. In *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017) the CAAF reiterated:

> The Supreme Court has stated time and again that courts presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first cannon [of statutory interpretation] is also the last: judicial inquiry is complete.

While I note this issue, I leave it to my superior court to determine whether the holding in *Johnson* should be revisited. Accordingly, I understand that under *Johnson*, Article 85(a)(3), UCMJ, is a codified rule of evidence that allows the

factfinder to infer a criminal *mens rea* to prove an Article 85(a)(1) or (2) offense from an accused's enlistment in a foreign army.[10]

Applied to this case, I accept the inference that appellant, knowing his unit would deploy in the meantime, intended to shirk important service when he enlisted in a foreign army for five years. Recognizing that the trial court saw and heard the evidence, I therefore find the evidence factually sufficient and concur with this court's decision in this case.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[10] *Johnson* specifically addressed only Article 85(a)(1) offenses that involve an intent to remain away permanently. However, the reasoning of the case would apply to an intent to shirk important service, although perhaps with less force.